**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**GARY WAYNE DUBBERLY,**

             Plaintiff,

**v.**                                **CASE NO. 3:04-cv-1064-J-16MCR**

**STANDARD INSURANCE COMPANY,**

             Defendant**.**

_____/

**O R D E R**

Before the Court is the Plaintiff's Motion for Summary Judgment (Dkt. 23), to which the

Defendant filed a Response in Opposition (Dkt. 28). The Defendant also filed a Motion for

Summary Judgment with an attachment in support (Dkt. 24) and the  Plaintiff filed a Response in

Opposition (Dkt. 27).

**I.**      **Procedural Posture**

Plaintiff filed his Complaint (Dkt. 1) pursuant to the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1001, *et seq.,* on October 7, 2004. Plaintiff is seeking Long Term

Disability ("LTD") benefits under a group long term disability insurance plan (the "Plan")

sponsored by his former employer, Ryder Systems, Inc. ("Ryder"), for which Standard Insurance

Company ("Standard") is the Plan Administrator and the fiduciary (Dkt. 1 at 2). Plaintiff now

moves for Summary Judgment arguing he is entitled to LTD benefits  from August 9, 2001, the

date Plaintiff's claim was closed, through the date of the Court's Order as well as interest, costs

and attorney fees.

The Defendant also moves for Summary Judgment arguing it properly denied Plaintiff's

disability claim after determining he no longer satisfied the definition of disability under the Plan. As a result, the Defendant urges the Court to enter judgment in its favor as a matter of law.

## II.    Background

Plaintiff was employed as a truck driver for Ryder when on July 27, 1992, he was involved in an on-the-job motor vehicle accident (Dkt. 23 at 2). Following the accident, Plaintiff requested several days leave from work and informed Ryder that he needed to see his chiropractor (Administrative Record "AR" 00507, 00531-530). Plaintiff attempted to continue his employment, but as of September 26, 1992, he stopped due to symptoms allegedly connected to the motor vehicle accident (AR 00507). Plaintiff was referred to a neurologist, Dr. Stephen Pappas and a neurosurgeon, Dr. Calvin Hudson (AR 00506). On October 20, 1992, Plaintiff underwent a neurological evaluation by Dr. Pappas concerning Plaintiff's complaints of neck and shoulder pain (AR 00717). On approximately November 1, 1992, Plaintiff underwent a Magnetic Resonance Imaging ("MRI") which revealed a "herniated nucleus pulposus at C5-6 centrally and to the left." (AR 00525).

Several months later, Plaintiff applied for LTD benefits (AR 00429-427). Defendant, upon reviewing the submitted documentation, informed Plaintiff his claim for LTD benefits was approved and that he  would be receiving  benefits as of March 27, 1993 (AR 00468, 00520). Defendant also obtained a Repayment Agreement from Plaintiff whereby Plaintiff's LTD benefits could be offset against other benefits Plaintiff may receive, such as social security or workers' compensation (AR 00467-465). Plaintiff was awarded workers' compensation benefits effective September 27, 1992 and this award was offset against Plaintiff's LTD benefits (AR 00489, 00521).

On November 22, 1993 Plaintiff was admitted to St. Vincent's Hospital with complaints of

headaches, neck pain and numbness (AR 00717). An electromyogram was taken and reportedly produced abnormal results (AR 00717, 01136). On December 20, 1993 Plaintiff was again admitted to St. Vincent's Hospital to undergo surgery performed by Dr. Hudson involving "anterior fusion of C5-6 with removal of the herniated nucleus pulposus and arthritic spur, and decompression of the C5-6 nerve root, bilaterally." (AR 00550, 001136). On February 14, 1994 Dr. Hudson saw Plaintiff and noted that he is having "[s]ome slight neck pain but he is having more left leg and back pain now." (AR 00552). Dr. Hudson also informed Plaintiff that he had a "lateral disc out to the left, lateral to the facet at L4-5" and that a percutaneous discectomy might be beneficial. Id. On May 10, 1994, Dr. Hudson performed the percutaneous discectomy (AR 00556).

Defendant notified Plaintiff through a letter dated April 4, 1994 that the definition of disability under the Plan, as it applies to Plaintiff, would be modified after March 26, 1995 (AR 00520). Specifically, Defendant provided the definition changes from being disabled under a claimant's "regular occupation" to being disabled under "any occupation" after twenty-four months. Id. The Defendant informed Plaintiff that due to the change in the definition, his claim would be reviewed. Id.

On June 16, 1994, Dr. Hudson wrote a letter concerning Plaintiff and advised that "this patient should restrict excessive turning of his head from side to side, perhaps no more than ten times an hour and neither should he lift more than 30 pounds. These are permanent limitations" (AR 00562). Taking these restrictions into consideration, a vocational consultant with the Defendant performed an assessment of Plaintiff's transferable skills on December 5, 1994 (AR 00571-570). The assessment report outlined that Plaintiff completed the eleventh grade and does not appear to have any further formal education. It also highlighted that Dr. Hudson's restrictions suggest Plaintiff

"could return to Sedentary and Light Physically Demanding labor if he did not have much movement of his head required, especially side to side." (AR 00571). The report therefore lists positions such as a security guard, electronic assembler or small parts assembler that might be appropriate for Plaintiff. The report notes, however, that because Plaintiff lives in an agricultural area that contains some warehousing, it would be beneficial to have a follow-up with a local vocational consultant (AR 00570).

Defendant then hired an outside vocational consultant and on February 15, 1995, the consultant interviewed Plaintiff (AR 00582-578). The vocational consultant found that Plaintiff "may never be able to return to his pre-injury occupation as a truck driver based upon his physical limitations coupled with his stated level of pain. Physically, I do feel [Plaintiff] is certainly capable of performing light work." (AR 00580). This assessment report, similar to the December 5, 1994 assessment, underscores the difficulty of Plaintiff finding employment in his labor market of Waycross, Georgia as it is mostly industrial and has few "light jobs" available (AR 00578). Furthermore, the assessment report provides "Plaintiff has thought about returning to work, but [he] is not sure what is available to him given his work limitations and lack of extensive work history. Given that his past vocations have been industrial in nature, he will have limited transferable skills." Id.  Apparently using this information as a basis, Defendant wrote to Plaintiff on March 21, 1995 informing him that he continues to qualify for LTD benefits despite the change in the Plan's definition of disability (AR 00587). The letter specifically asserts "[w]e have determined that you cannot perform with reasonable continuity the material duties of any occupation which you have the education, training and experience to perform. We are pleased to notify you of your continued eligibility for benefits after March 26, 1995." Id.

In early July 1995, the Defendant was advised by an independent vendor known as Benefit Team Services, Inc., that after speaking with Plaintiff and reviewing his file, the vendor would not assist Plaintiff in his claim for social security disability benefits as the vendor believed Plaintiff would not be approved (AR 00598). The letter contends that "[a]lthough [Plaintiff] is evidently unable to perform the duties of his past work we believe that social security would determine that he is capable of light or sedentary work." Id. Additionally, Dr. Hudson filled out an Attending Physician Statement ("APS") dated September 25, 1995 describing Plaintiff's current work activity restrictions as well as his physical and mental limitations as "no lifting over 25 [pounds]; no bending more than 4 [times per hour]. These are permanent limitations." (AR 00599). The APS also had Dr. Hudson anticipating that Plaintiff would be able to return to work by October 15, 1995. A different APS form completed by Dr. Hudson and dated October 16, 1995, however, fails to address when Plaintiff would be able to return to work and only describes his progress as "[i]mproved" and his medical prognosis as "good." (AR 00600).

On November 5, 1996, Dr. Hudson wrote to Dr. Robert Sury requesting Dr. Sury help place Plaintiff in a conditioning program to strengthen his cervical and lumbar spine (AR 00621). Several weeks later, Dr. Sury performed an Independent Medical Evaluation ("IME") on Plaintiff (AR 00620-618). Dr. Sury's impression was "[n]eck and low back pain, status post cervical and lumbar spine surgery." (AR 00618). Dr. Sury recommended Plaintiff begin physical therapy and that he would like to re-evaluate him after he completed it. Id. On January 11, 1997, Dr. Hudson wrote a letter noting that a functional capacity evaluation ("FCE") completed on Plainitff "implied that he might be able to do the job of log compliance clerk[,]" although Dr. Hudson believed Dr. Sury should be contacted regarding Plaintiff's current status and abilities (AR 00622). On February 3,

5

1997 Dr. Sury wrote that he had reviewed an FCE from June 10, 1996 which had recommended Plaintiff attend a work hardening program in order to improve his ability to perform prolonged activities without experiencing a pronounced pain increase. Dr. Sury agreed that Plaintiff attend such a program prior to attempting a return to employment (AR 00648).

In March 1997, Plaintiff began a work hardening program involving physical, occupational vocational and biofeedback therapy (AR 00644-623). On March 27, 1997, a therapist's notation states Plaintiff's "effort + motivation appears minimal." (AR 00638). A biofeedback progress note dated March 31, 1997 states that Plaintiff was only seen for three sessions "and at that time the patient was discontinued due to lack of compliance." (AR 00634). Moreover, the occupational progress notes provide a daily description of Plaintiff's activities (AR 00626-623). Plaintiff appears to have tolerated a six to seven hour day, although multiple notations exist referencing "low motivation," "client continues to not be very motivated," and "the client continues to lack motivation."(AR 00624-623).

A vocational evaluation from March 1997 recommended Plaintiff contact his employer to see about positions on a modified duty basis and if that was not possible, that Plaintiff be referred to the State of Florida Training and Evaluation Program (AR 00649). It was also recommended that Plaintiff be referred to jobs "allowing him to sit and stand as needed and utilize his residual dexterity in such positions as small engine repair; cartridge technician repair; and, microfilm mounter. Once he gets his GED he can consider employment as security guard or light delivery driver." Id.; See (AR 00661-655 for an initial work capacity evaluation).

On December 8, 1997 Plaintiff filed an application for social security disability benefits (AR 00720). On January 23, 1998 a letter was sent to Plaintiff from the Social Security Administration

denying his claim (AR 00686-681). In explaining the denial, the letter states "[w]e have determined that your condition is not severe enough to keep you from working. We considered the medical record and other information, your age, education, training, and work experience in determining how your condition affects your ability to work." (AR 00681). Plaintiff appealed this decision and an Administrative Law Judge ("ALJ") held a hearing and a supplemental hearing on Plaintiff's claim (AR 00720). After reviewing the case, the ALJ affirmed the denial of benefits. The ALJ specifically found that "[d]espite claimant's continued complaints of pain, the evidence does not support the claimant's allegations of totally disabling pain." (AR 00713). The ALJ called upon a vocational expert to determine, taking into account Plaintiff's work restrictions, other potential jobs Plaintiff could perform. The vocational expert testified "that assuming Mr. Dubberly's specific work restrictions, including the effects of pain, he was capable of making a vocational adjustment to work as surveillance system monitor, order clerk-food and beverage, and service dispatcher." (AR 00711). Based on the foregoing, the ALJ determined Plaintiff was not entitled to disability benefits. Id.

On September 8, 1998, an APS from Dr. Hudson found Plaintiff's progress to be unchanged and that Plaintiff continued to be restricted from excessively turning his head and not lifting over twenty pounds (AR 00701). An almost identical APS was submitted by Dr. Hudson on September 13, 1999 (AR 00726). On April 17, 2000, Defendant had another vocational evaluation conducted to examine Plaintiff's ability to work under the any occupation definition of the Plan (AR 00737-728). The evaluation found that Plaintiff could perform work as a security guard or as an assembler of small products I or small products II (AR 00734-732). It also found that "[t]hese occupations exist in the claimant's labor market in sufficient numbers to allow reentry into the workforce given the claimant's residual functional capacity and transferable skills." (AR 00732).

After receiving this evaluation and upon a review of Plaintiff's record, the Defendant sent a notice to Plaintiff on May 1, 2000 that his claim had been closed (AR 00746-744). The letter outlines that while Plaintiff's limitations preclude him from medium and heavy work, it is reasonable to expect that Plaintiff could perform full-time light or sedentary work (AR 00745). Shortly after sending this letter, Defendant received an APS from Dr. Hudson on May 26, 2000 (AR 00747). The APS provided that Plaintiff's most recent visit was in August 1999, that Plaintiff's work restrictions still applied and that the current course of treatment was only medication. Id. The APS also provided that Dr. Hudson was unable to determine when Plaintiff could return to work. Id. On June 7, 2000, Plaintiff appealed the Defendant's denial of his LTD benefits through legal counsel (AR 00749).

Plaintiff's claim was subsequently reviewed by Defendant's Quality Assurance Unit, a unit independent from the individuals who made the initial determination to close Plaintiff's claim. An internal summary from the Quality Assurance Unit dated October 19, 2000 alleges that Plaintiff's counsel failed to submit any additional information and that Plaintiff's counsel had not contacted Defendant since July 18, 2000 (AR 00796). Nevertheless, the Quality Assurance Unit determined further investigation of Plaintiff's claim was necessary as Defendant needed to obtain updated medical records as well as examining a $450,000.00 settlement received by Plaintiff (AR 00795). The Quality Assurance Unit also recommended the Benefits Department reinstate Plaintiff's LTD benefits while the investigation transpired (AR 00806).

On December 29, 2000 Defendant wrote to Plaintiff's counsel requesting updated medical records in order to clarify the severity of Plaintiff's orthopedic condition (AR 00842). The Defendant also requested medical documentation on Plaintiff's alleged cardiac condition and

information on the $450,000.00 settlement. Id. The Defendant obtained chart notes from both Dr.

Borgman, a physician following Plaintiff's hypertension, weight and elevated liver function tests

and Dr. Hudson (AR 00902, 00916).  Dr. Hudson's office visit notes reflect that Plaintiff was seen

only three times between September 2, 1998 and June 7, 2000 and that upon his last visit, Plaintiff

was not given a return appointment as he could return if necessary (AR 00910). There is also a note

from Dr. Hudson, dated June 14, 2001, in which Dr. Hudson wrote Plaintiff's limitations "continue

to be no turning of the head to the extremes more than 10 times an hour and no bending of his low

back more than 5 times and [sic] hour and he should not lift more than 25 pounds. These are all

permanent limitations." (AR 00916). Furthermore, Dr. Borgman's notes from May 11, 2000 outline

Plaintiff's problems with hypertension and significant reflux disease (AR 00879). On May 30, 2000

Plaintiff returned to Dr. Borgman's office for a full exam and on August 30, 2000, Dr. Borgman's

notes indicate Plaintiff's concern over his liver function tests and abnormal lipid profile (AR 00878).

Dr. Borgman's notes reflect he saw Plaintiff again on October 31, 2000, November 30, 2000,

December 29, 2000 and on February 26, 2001 (AR 00883-880). According to the November 30,

2000 progress note, Plaintiff's back pain was allegedly being controlled by the prescription

medication Lortab and on February 26, 2001 the progress note states that his chronic back pain

appears to be no better or worse and that he should continue with the Lortab as needed (AR 00883,

00881). There was also information pertaining to Plaintiff's hospitalization in 1998 for an episode

of atrial fibrillation, although treatment records indicate this is now stable (AR 00871-867).

After obtaining these records, Defendant had Dr. Bradley Fancher review Plaintiff's entire

file (AR 00923-921). Dr. Fancher, a board certified physician in internal medicine, states in his

report dated August 2, 2001 that "at the time of the Social Security Administration decision in  1999

it was noted that the claimant was able to perform house-hold chores such as laundry, washing dishes, cooking and grocery shopping. It was noted he could mow the grass using a riding mower. . .that he was capable of using a blower, [] hobby fishing . . .and working in a garden shared with neighbors." (AR 00923).  Accordingly, Dr. Fancher  agreed with the Social Security Administration's finding that Plaintiff's abilities exceeded his alleged degree of impairment. Dr. Fancher added "[t]he claimant should be able to perform sedentary or light work on a full-time basis with the additional limitations and restrictions that have been suggested by Dr. Hudson." Id. Shortly after Dr. Fancher's report, the Defendant notified Plaintiff in a letter dated August 9, 2001 that Plaintiff does not meet the definition of disability under the Plan as Defendant's review found Plaintiff could perform the material duties of other occupations (AR 00925-924). The letter notes, however, that prior to Plaintiff's claim being officially closed, it first has to be independently reviewed by the Quality Assurance Unit.

On August 24, 2001 Defendant formally notified Plaintiff's counsel that Plaintiff's claim had been referred to the Quality Assurance Unit for a final review (AR 00926). Plaintiff's counsel, on August 27, 2001 wrote to Defendant in what appears to be an appeal from the determination Plaintiff was not disabled as well as a request for certain documentation (AR 00929-927). Defendant subsequently sent letters, during late September and October 2001, to Plaintiff's counsel keeping him informed of the review process and providing portions of the requested information (AR 00935-932). On January 24, 2002, Plaintiff's counsel again wrote to Defendant asserting that his August 27, 2001 request for a copy of the report from a vocational consultant had gone unanswered. Plaintiff's counsel also specifically requested "each and every piece of evidence, medical report, vocational report, etc.," in order that Plaintiff have the opportunity to provide a response (AR 00938-

937). Plaintiff's counsel argued that because Defendant retained and paid for counsel to represent Plaintiff's claim to the Social Security Administration, the ALJ was "not inclined to provide" a finding of disability that would directly benefit the Defendant. Id. As a result, Plaintiff's counsel asserts the use of the ALJ's finding by the Defendant is "unjust and inappropriate." (AR 00937). Plaintiff's counsel also reiterated concern over the "substantial medication" taken by Plaintiff and the impact of the medications side effects (AR 00938). On February 6, 2002, Defendant responded that all requested documentation was being compiled and that the Defendant understood Plaintiff's counsel was seeking the Quality Assurance Unit to delay its review until after Plaintiff's counsel had the opportunity to review and submit additional information (AR 00939). Defendant added that in the interim, Plaintiff's counsel would be kept apprised of the status of the review.

In mid-March 2002, Plaintiff's counsel sent Defendant medical records from Dr. Borgman including records related to an MRI performed in February 2002 (AR 00981). Among these records is a progress note dated June 13, 2001 which states Plaintiff's back problems prevent him from doing any "vigorous exercise. . . however he does [do] various household chores and walking when he can. Overall he reports that he's feeling good at this time with the exception of his back." (AR 00973). Another progress note dated February 6, 2002 states "[d]espite years of therapy, there appears to be no significant improvement and in fact he appears to be doing actually worse." (AR 00977). On April 26, 2002 Plaintiff's counsel sent Defendant a report from Dr. Borgman which detailed that Dr. Borgman's clinic had been following Plaintiff since August 2000 (AR 00986). The report also described reviewing a note from Dr. Ullah dated May 14, 1998 that shows "even then, [Plaintiff] was disabled because of chronic long-standing low back problems." (AR 00986). The report from Dr. Borgman continues that Plaintiff has difficulty standing for long periods of time and

that the pain medication taken multiple times a day does not appear to offer significant relief. Id. Moreover, Dr. Borgman's report notes that the February 2002 MRI revealed "there is significant osteophytosis as well as central disc herniation at the levels of C-6/C-7 as well as C-5/C-6." Id. As a result, Dr. Borgman's report alleges that since he began following Plaintiff, his condition has not "significantly improved" and in some ways, his condition appears to have worsened. Id.

In early May 2002, Defendant wrote to Plaintiff's counsel requesting a complete copy of Dr. Borgman's records, including a copy of the $450,000.00 settlement agreement and the records related to the February 2002 MRI (AR 00988). Plaintiff's counsel responded on May 15, 2002 that he had previously sent Dr. Borgman's records on March 15, 2002 and that Plaintiff signed an authorization allowing Defendant to obtain the MRI records on its own (AR 00992). Plaintiff's counsel also alleged that Plaintiff did not have a copy of the settlement agreement. Id.

On September 17, 2002, Defendant had Plaintiff's medical records reviewed by an independent physician consultant who specializes in neurology, Dr. Elias Dickerman. After reviewing Plaintiff's file, a summary of Dr. Dickerman's findings was written by the Defendant (AR 00996). The summary alleges Dr. Dickerman's belief that the report attached to the February 2002 MRI must contain an error. Specifically, that the "Findings" portion of the report did not correspond to the "Impression" portion. Id. The summary asserts that Dr. Dickerman was unable to provide a medical opinion considering "the erroneous MRI report" and requested the actual MRI films be obtained, as well as any other MRI films, so he could review them himself. Id. Accordingly, Defendant requested these materials from Plaintiff's counsel (AR 00999, 01010).

In responding to this request, Plaintiff's counsel sent additional medical records on December 4, 2002.  These records included a note from Dr. Hudson dated November 20, 2002

12

outlining that a myelogram and CAT Scan revealed Plaintiff had a "moderate central ruptured disc at C6-7." (AR 01101). Dr. Hudson's note continues that if Plaintiff could not tolerate his arm and neck pain, he should proceed with "an anterior cervical fusion and discectomy and plating at C6-7." Id. After receiving these records, Defendant again had Dr. Dickerman review Plaintiff's file. On January 7, 2003, Defendant summarized Dr. Dickerman's findings in a report that Dr. Dickerman reviewed, approved and signed (AR 01122-1120). According to the report, Dr. Dickerman contends that Dr. Hudson "essentially states that Mr. Dubberly has a chronic pain syndrome." (AR 01122). Nevertheless, Dr. Dickerman found  Dr. Hudson's restrictions of light level work capacity with the restrictions on neck movement and not lifting greater than 25 pounds to be reasonable limitations. Id. The report underscores Dr. Dickerman's belief that the infrequency with which Plaintiff sought medical evaluation on his neck and back pain are "indicative of no substantial change" in his symptoms. Dr. Dickerman asserts if Plaintiff's pain complaints were persistent and severe, a progressive escalation in prescribed pain medication would likely be evident. Moreover, that if Plaintiff's neck and back had continued to deteriorate to a degree where Plaintiff could not perform sedentary or light work, documented physical findings such as loss of reflexes or focal muscle atrophy would be present. Dr. Dickerman does not believe these have been described or documented in the medical records (AR 01121). Lastly, as to the alleged impact on Plaintiff due to his medications side effects, Dr. Dickerman failed to find any evidence to support this contention. Instead, Dr. Dickerman found Plaintiff's physicians had not restricted Plaintiff's drivers license, which allegedly equates to Plaintiff having minimal to no side effects. Based on the foregoing, Dr. Dickerman's finding is that Plaintiff can perform sedentary or light level work activity (AR 01120).

On January 17, 2003 Defendant notified Plaintiff's counsel that the Quality Assurance Unit

had completed its review and found that the decision to close Plaintiff's claim for LTD benefits was reasonable and appropriate (AR 01137). Despite receiving this notification, Plaintiff's counsel wrote a letter to Defendant on March 31, 2003 stating that additional medical information exists that Plaintiff wanted Defendant to consider. The information was related to Plaintiff's claim with the Social Security Administration as Dr. Borgman had provided responses to inquires posed by the administration.  Plaintiff's counsel attached these responses to the letter and informed the Defendant that Plaintiff was scheduled to have additional surgery with Dr. Hudson on May 28, 2003 (AR 01158). On May 6, 2003 Defendant wrote to Plaintiff's counsel that "as a courtesy to Mr. Dubberly" the administrative record would be reopened for no more than ninety days from the date of Plaintiff's counsel's March 31, 2003 letter (AR 01171). This deadline was subsequently extended for an additional thirty days (AR 01202). In the letter providing the extension, Defendant noted that the relevance of the cervical spine surgery Plaintiff had in May 2003 is "as yet undetermined." (AR 01202).  The letter continues that while it has been indicated Plaintiff's physician is going to submit a report regarding Plaintiff's functional limitations after the May 2003 cervical surgery, Plaintiff has not yet "provided [Defendant] with existing medical documentation that would allow us to begin the claim review process by considering the relevance of [Plaintiff's] recent neck surgery to his previously closed claim." Id.  In other words, the letter explained Plaintiff's current condition and recent surgery may not necessarily provide sufficient evidence to support Plaintiff's continuous disability after the claim closure date of August 9, 2001. Id.

Plaintiff's counsel then mailed Defendant a sworn statement from Dr. Hudson taken on July 16, 2003 (AR 01455-1431). Dr. Hudson specifically outlined that after the MRI, myelogram and CAT Scan showed a ruptured disc at C6-7, he performed an anterior cervical fusion, discectomy and

plating in May 2003 (AR 01451). Dr. Hudson explained that in October 2002, after examining Plaintiff and reviewing his MRI, he thought "he was totally disabled because of the severe pain that he'd been having since the first of 2002. And that's why after evaluating him and doing the myelogram and CAT scan, and when I found the rupture, that I felt that he would be best served going ahead and having the fusion." (AR 01443). Moreover, Dr. Hudson articulated that after the surgery, Plaintiff is still "disabled at this time" and that his restrictions would be no turning of the head more than six times per hour and not lifting more than fifteen pounds (AR 01443, 01437). Dr. Hudson testified that Plaintiff could not perform the duties of a small products assembler and that he could only serve as a security guard if he were not required to physically defend people (AR 01439).

In November 2003, Plaintiff began treatment with the Institute of Pain Management (AR 01358). On November 6, 2003, Dr. Bernard Canlas performed the initial evaluation noting that Plaintiff "describes the pain as worse with sitting, standing, walking, with damp weather, morning and evening with bending forward and backward in both the cervical and lumbar region." Id. After conducting a physical examination, Dr. Canlas found that Plaintiff "had pain on forward flexion at 45 degrees. There was no pain on back extension. . .[s]traight leg raise was positive at 60 degrees of the left lower extremity, negative at 90 degrees on the right lower extremity." (AR 01356). Dr. Canlas' impression was postlaminectomy syndrome of the cervical spine with radiculopathy, postlaminectomy syndrome of the lumbar spine, degenerative disc and joint disease of the lumbar spine with radiculitis. Id. Additionally, on November 21, 2003, Dr. Dennis George of the Institute of Pain Management found that Plaintiff's pain score was a seven out of ten and that he is in a "moderate degree of pain." (AR 01359). Dr. George started Plaintiff on Duragesic patches and

15

Zanaflex as well as giving him a prescription for Actiq for his epidural steroid injections. Id.

After receiving this updated medical documentation, Defendant apparently sought further vocational information (AR 01362). Defendant also wrote to Dr. Dickerman requesting a supplemental medical review (AR 01365-1363). Dr. Dickerman's report, dated December 15, 2003, states he does not believe that having a second level fusion at the C6-7 level should provide any further limitations and restrictions, and thus directly disagreed with the additional restrictions Dr. Hudson articulated in his July 2003 statement (AR 01374). Dr. Dickerman continued that "[t]he patient's neurological examination has remained nonfocal, with full power, sensation, and reflexes. There is no reasonable medical explanation why [Dr. Hudson] modified and increased his restrictions." Id. Dr. Dickerman therefore opined that the medical information does not reveal sufficient evidence to support Plaintiff's inability to perform sedentary or light work after August 9, 2001 (AR 01373).

Shortly thereafter, Defendant's Quality Assurance Unit informed Plaintiff's counsel via a letter dated March 16, 2004 that the review of Plaintiff's claim had concluded (AR 01384-1381). The letter outlined that after its "third and final review" of Plaintiff's claim, the Quality Assurance Unit reaffirmed that the claim closure determination was correct (AR 01384). Plaintiff's LTD claim was therefore denied and closed (AR 01382).

## III.    Standard of Review

The Court should grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Everett v. Napper,

833 F.2d 1507, 1510 (11th Cir. 1987); Edwards v. Acadia Realty Trust, Inc., 141 F. Supp. 2d 1340,

1344-45 (M.D. Fla. 2001).  The Court will construe the record and all inferences that can be drawn

from it in the light most favorable to the nonmoving party, and the moving party bears the initial

burden of establishing the absence of a genuine material fact.  See United States v. Diebold, Inc.,

369 U.S. 654, 655 (1962); Samples on Behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330

(11th Cir. 1988).  Once this burden is met, however, the opposing party must "go beyond the

pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'"  Celotex

Corp., 477 U.S. at 342.  The Eleventh Circuit explained in Samples that the opposing party need

only present evidence from which a jury might return a verdict in its favor in order to survive the

moving party's motion for summary judgment.  See Samples, 846 F.2d at 1330; see also Augusta

Iron & Steel Works v. Employers Insurance of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).

Notably, the Supreme Court pointed out in Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986), that the moving party's burden only extends to facts that might affect the outcome of

the lawsuit under the governing law, as "[f]actual disputes that are irrelevant or unnecessary will not

be counted."  Summary judgment will only be granted if all facts and inferences point

overwhelmingly in favor of the moving party, such that a responsible jury could not find in favor

of the opposing party.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  If

there is conflicting evidence that will permit differing reasonable inferences, the case will be

submitted to the jury.  See Augusta Iron & Steel, 835 F.2d at 856.

## IV.    Standard of Review for ERISA Claims

The Eleventh Circuit "'adopted the following standards for reviewing administrators' plan

17

interpretations: (1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest.'" HCA Health Services of GA., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001)(quoting Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997)).

In reviewing a claims administrator's determination, the court must proceed through a series of steps. HCA Health Services of GA., Inc., 240 F.3d at 993. The court first must apply the *de novo* standard to "determine whether the claim administrator's benefits denial decision is 'wrong'(*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision." Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (citing HCA Health Services of GA., Inc., 240 F.3d at 993 n.23). If the court finds the administrator's decision is *de novo* wrong, the court must determine whether the administrator is granted discretion in reviewing claims. If the court determines the administrator is not granted discretion, the court must "end judicial inquiry and reverse the decision." Id. If the administrator's decision was *de novo* wrong and discretion was given, the court must "then determine whether 'reasonable' grounds supported" the decision. Id. (internal citations omitted). If the court does not find reasonable grounds exist, the court must reverse the administrator's decision. Id. However, if reasonable grounds do exist, the court must determine if the administrator operated under a conflict of interest. If no conflict of interest is present, the court may affirm the administrator's decision. Conversely, if a conflict of interest does exist, the court will apply heightened arbitrary and capricious review to the administrator's decision to affirm or deny it. Id. "If the claims administrator was acting under a conflict of interest, 'the burden shifts to the [administrator] to

prove that its interpretation of the plan provisions committed to its discretion was not tainted by self interest.'" HCA Health Services of GA., Inc., 240 F.3d at 993 (quoting Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1566 (11th Cir. 1990))(internal citations omitted).

**V.     Discussion**

While both parties agree the heightened arbitrary and capricious standard of review is applicable, the Court must begin with a *de novo* review of the administrative record to determine if Defendant's interpretation of the Plan and subsequent denial of Plaintiff's LTD benefits was wrong. In thoroughly reviewing the entire record, and despite Plaintiff's unfortunate discomfort, the Court cannot hold that the Defendant's decision to deny Plaintiff LTD benefits was wrong.

To briefly recapitulate, Plaintiff first became entitled to LTD benefits on March 27, 1993 (AR 00520). Under the terms of the Plan, an individual may receive benefits for twenty-four months if the individual is disabled under the "own occupation" definition of disability (AR 00058, 00520). After twenty-four months, however, in order for an individual to continue receiving benefits, the individual must meet the "any occupation" definition of disability under the Plan. The any occupation definition states:

> You are Disabled from all occupations if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training and experience.

Id.  Plaintiff's claim was re-evaluated after twenty-four months and on March 21, 1995, Defendant informed Plaintiff he met the any occupation definition of disability (AR 00587). Plaintiff therefore continued to receive LTD benefits until August 2001, when Defendant determined Plaintiff was not disabled under the Plan and administratively closed his claim (AR 00925, 01137).

After reviewing the record, the Court agrees with the Defendant's decision and does not find

19

the medical evidence in the record sufficient to support Plaintiff being disabled under the any occupation definition of the Plan. Instead, the record reflects that while Plaintiff is apparently in pain, he nevertheless is not disabled and could return to employment as long as the position complied with certain restrictions. These restrictions, which have been modified by Dr. Hudson over the years, limit Plaintiff from bending more than four times per hour, not lifting over twenty pounds as well as not turning his head side to side more than eight to ten times per hour (AR 00562, 00599, 00701, 00747). In Dr. Hudson's July 2003 sworn statement, he apparently increased the restrictions noting they "will probably be greater now" and "should be about" Plaintiff not turning his head more than six times an hour and not lifting more than fifteen pounds (AR 01437). Dr. Hudson did concede, however, that Plaintiff could be employed as a security guard as long as there was no physical contact (AR 01439). Dr. Dickerman directly disagreed with Dr. Hudson's decision to increase Plaintiff's restrictions in his December 15, 2003 report, although Dr. Dickerman did concur that Plaintiff could work as a security guard as long as physical contact was not necessary (AR 01374, 01439). Besides Dr. Hudson's July 2003 statement, the Court does not find any other evidence documenting that Plaintiff's restrictions should be increased. Rather, the record reflects the reviews by Drs. Fancher and Dickerman found Dr. Hudson's restrictions, prior to his July 2003 sworn statement, did not preclude Plaintiff from performing sedentary or light work as well as vocational evaluations listing employment positions that complied with these restrictions (AR 00571-70, 00582-578, 00622, 00651-649, 00737-728, 00923-921, 00996-995, 01377-1372). <u>See</u> (AR 00598, 00644-623, 00720-709). Even after Dr. Hudson's July 2003 statement, a vocational case manager provided Defendant with potential security guard positions for Plaintiff (AR 01362). As a result, under the language of the Plan, the Court does not find the Defendant's decision to be

wrong.

Moreover, while the Court finds no reason to re-summarize the reviews and medical documentation discussed above, the Court does want to briefly examine certain  aspects of the administrative record. The Court initially notes the vocational evaluation report dated December 5, 1994 found that Dr. Hudson's restrictions suggested Plaintiff could return to sedentary or light work, but that because Plaintiff was living in a "very limited" labor market in Waycross, Georgia, it would be beneficial to have a follow-up evaluation done by a local vocational consultant (AR 00570). The follow-up evaluation also revealed Plaintiff could perform light work, but that it would be difficult to find an employment position in Waycross that complied with Plaintiff's restrictions (AR 00578). Shortly after receiving this evaluation, Defendant notified Plaintiff that he was eligible to continue receiving LTD benefits (AR 00587). Defendant now argues, and the Court agrees, that an underlying reason behind Plaintiff's LTD benefits being continued was the difficulty associated with finding suitable employment in his depressed labor market (Dkt. 28 at 12). See (AR  01135). Once Plaintiff moved to Florida, finding suitable employment with these restrictions no longer remained an obstacle.

The Court also finds the documentation related to Plaintiff's participation in a 1997 work hardening program useful (AR 00644-623). The progress notes contain various references related to Plaintiff's lack of motivation, effort and attendance (AR 00638-623). This lack of interest is further supported by Plaintiff being "fine" with having his program cancelled early (AR 00642). The lack of motivation and effort is problematic for the Court as it leaves the impression Plaintiff's desire to improve his abilities was minimal.

Also of import to the Court is the analysis set forth by the Administrative Law Judge ("ALJ")

in affirming the denial of Plaintiff's claim for social security disability benefits (AR 00720-706). After conducting a hearing, a supplemental hearing and having a vocational expert testify about potential employment positions for Plaintiff, the ALJ found Plaintiff could "make an adjustment to other work which exists in significant numbers in the national economy." (AR 00719, 00711). The ALJ therefore found that Plaintiff retained the capacity to perform "the exertional" demands of sedentary work (AR 00712).

Lastly, a review of the record underscores Defendant's consistent effort to ensure updated medical documentation was obtained and reviewed. This is evident during Plaintiff's appeal in June 2000 when Defendant's Quality Assurance Unit conducted an independent review and determined further investigation was necessary (AR 00798). Once Defendant collected updated documentation, Plaintiff's file was sent to Dr. Fancher to review. Dr. Fancher's 2001 report found that if Dr. Hudson's restrictions were imposed, Plaintiff should be able to perform sedentary or light work on a full-time basis (AR 00923). Instead of attempting to bolster Plaintiff's claim with substantive documentation, Plaintiff's counsel wrote to Defendant arguing the use of an independent medical exam from December 1996 was unreasonable and that it was not rational to reference the findings of the ALJ at the Social Security Administration due to Defendant having retained counsel for Plaintiff's social security appeal (AR 00929-928). Plaintiff's counsel also described the side effects of Plaintiff's medication, without any records supporting Plaintiff actually suffered from any side effects. Id. The Court finds such arguments insufficient and not beneficial.

Based upon the foregoing, the Court does not find Defendant's decision to deny Plaintiff's LTD claim to be *de novo* wrong. The Court must therefore end the judicial inquiry and affirm the decision. Williams, 373 F.3d at 1138.

Alternatively, if the Court were to apply the heightened arbitrary and capricious standard of review, the Court would still conclude Defendant is entitled to summary judgment. Indeed, not only was Defendant's decision to deny Plaintiff's LTD benefits reasonable, but there is no evidence the decision was tainted by self interest. To underscore the decision was not motivated by self interest, the Defendant submitted the Declaration of Lori Jensen, the current supervisor of Defendant's Disability Benefits, in the Employee Benefits Department (Dkt. 24, Attachment 1). Ms. Jensen, after highlighting Defendant's review of Plaintiff's claim, states "the decision [to deny Plaintiff's claim] was based entirely on the relevant provisions of the Policy and the information contained in the. . .Administrative Record." (Dkt. 24, Attachment 1, ¶ 9). The Court agrees and notes that during the investigation of Plaintiff's initial appeal, Defendant reinstated Plaintiff's benefits (AR 00806, 00843). The Court also notes Defendant not only allowed Plaintiff an additional appeal of his claim, but extended the time in which Plaintiff could submit documentation (AR 01171, 01202). Consequently, the Court finds the evidence supports Defendant's decision was reasonable and not tainted by self interest. Summary judgment will therefore be entered for the Defendant.

Accordingly, upon due consideration, it is hereby **ORDERED:**

1.      Defendant's Motion for Summary Judgment (Dkt. 24) is **GRANTED**.

2.      Plaintiff's Motion for Summary Judgment (Dkt. 23) is **DENIED**.

3.      The Clerk is directed to enter judgment in favor of the Defendant and close this file.

**DONE AND ORDERED** at Jacksonville, Florida this 9th day of December, 2005.

JOHN H. MOORE II
United States District Judge

23

Copies to: Counsel of Record